Priya Swaminathan for Appellant Liralisa Stevens. This is a case about an inmate who has been suffering from gender dysphoria for about 27 years. Over the years she's had a number of harmful behaviors because of this, including in the 1990s trying to kill herself. And she's had a range of side effects to the therapy, the estrogen therapy that she was prescribed. Some of them have been more minor, some of them have been more major. One of the major side effects that she had was in 2010 she developed a brain tumor, a benign brain tumor. It was not cancerous. So she brought a case in state court, state habeas proceeding, and subsequently in federal court on that exact injury, stating that estrogen therapy was causing these severe side effects and therefore she should be given sexual reassignment surgery. Now under the law at the time, SRS was non-option for an inmate. And so the state court held that SRS was not an alternative and denied her application. The federal court found res judicata because she'd already brought the action in state court on that same injury. Subsequently she developed another brain tumor, a pituitary adenoma. And this, the record doesn't show whether it's cancerous or not. We simply don't know. We don't have the medical records. But the district court dismissed the action on because of the state, prior state and federal proceeding. Even though this is an absolutely new injury which incurred after the federal proceeding had concluded. There simply can be no res judicata on a new injury that happened after the prior proceedings concluded. Counsel, I must say I find this primary right theory very confusing. I'm not a I'd like opposing counsel to address the same question about how the California courts would deal with this. Let's say that I have a very nasty bout of diverticulitis and it's recommended that a portion of my intestine be removed. And then there's a lot of disagreement medically about whether that's a good five years later. And it's a final judgment. Five years later, same part of the intestine, but now there's a cancerous mass. Okay. Same surgery is requested, but for a new and physiologically different reason. Is that the same primary right? Because it's the same part of the body? Or is that a new and different primary right? I think it would have to be a different primary right. Because, you know, primary rights, you're talking about a couple of different things. What was the wrong that happened? And what's the injury? So you have two different components to it. And yes, it could be that there's the same harmful, as in it's an illness. In your example, it's actually even easier because you're talking about, you know, there's no wrongful conduct on anyone's part that is causing, other than the denial itself. Here it's slightly different. So here you have two separate illnesses happening at separate periods of time. And so it can be res judicata simply because you were denied medical treatment in one instance. You can be denied medical treatment when you have another completely separate illness that's happened. Here you have wrongful conduct on this part of the state, which is the estrogen therapy is what is causing these conditions. And then you have the injury. They're causing different injuries. So it's kind of like saying, you know, I was denied treatment from the estrogen therapy because I had a benign brain tumor. Now I have a cancerous brain tumor. But that judgment is applicable here. I mean, that would be reading the judge's decision so broadly, in both the state and the federal courts, to say that estrogen therapy could never cause any injury that could be severe enough for her to bring a cause of action. I have another question, too, which is a sort of, it's not really in the record, I'm sure, but why has there been no surgery date, or has there been now? The last time I talked to my client was to appraiser of the oral argument, and I have sought updates from her. Sometimes I do hear from her occasionally. There is delay, mail from the prison. But two months ago, I had not heard from her that there had been no surgery. And that's actually one of the questions I've asked. Is this something, is this a case that, in your view, would be amenable to mediation? It seems very strange to me that this surgery was approved years ago and has not happened. And is that something that mediation could assist with? There was a lengthy mediation in this case, and unfortunately, we were unable to resolve it to the satisfaction of both parties. Okay. So, but yeah, that is one of the questions I asked, because one of the claims they made is that the case is moot. But I said, how can it be moot if four years later? So in 2019, they found that the surgery was necessary for her. And the criteria that they used to determine that is that she's in such severe pain, or it's necessary to protect life. How can you, in 2019, find that there is treatment that is medically necessary to you're still waiting for that? Well, counsel, I have a question for you, if I may. First of all, when you had mediation previously, was it mediation in the state court or mediation in the federal court? Mediation ordered by this court, in this appeal, in this case. In this appeal, okay. Then my second question is, I'm having difficulty seeing why the same primary right is not involved, if in fact, in both the state case and the federal case, your client is asking for different, because of developments. Isn't this the claim, the same, that is the claim? I'm entitled to sexual reassignment surgery. But it's the judge's analogy again, because I don't think it is the motivation. I'm not talking about motivation that's important. And you're talking about the same remedy, right? I could have lung cancer, and then subsequently, I could develop another kind of cancer. And chemotherapy might be the same remedy for both of them. But just because I asked for relief for lung cancer, and I was denied that, doesn't mean that I, you know, I develop liver or throat cancer, and I'm told, I'm sorry, you can't, because you're asking for chemotherapy. I mean, that's just the remedy. That happens to be the remedy in both cases. But the injuries are completely different. I mean, you know, tomorrow, if they say she has a fatal liver, I mean, the fact that they changed their mind in 2019 shows you that this is a continuing medical condition that can get more severe. And if it does get more severe, does that mean I can't come back and say, you know, I'm gonna die in six months unless you give me this treatment? Because in 2013, you determined that it was not serious enough. Maybe it wasn't serious enough in 2012. You know, in 2016, I think it was serious enough, because by 2019, it had become serious enough. And this is the exception rather than the rule. The rule is that I can't come back unless it's under really necessary circumstances. So this is a continuing medical condition that has progressed from 2013 to 2019. We have no disagreement that in 2019 it's necessary. So it could have been necessary in 2016. It was determined not to be necessary in 20... So let's not even take two types of cancers. Let's say I have a condition where my throat hurts and it's very severe. I mean, I'm not very averse with medical illnesses. Let's say I have a condition that's pretty severe, you know, a throat condition that's pretty severe, and chemotherapy or something like that would alleviate it. But it turns into cancer in six months. You can't say that, oh, you know, you decided that this was not severe enough. That's basically the decision that they're saying, that in 2013, it was not severe enough to give her SRS, and it was not even actually available. But then, now I have cancer because of that. And I'm saying that, give me the treatment, I'm going to die in six months. It's not the same primary right, because it's not the same injury. It's not the motivation. I mean, it's not her motivation. She might have wanted it for 20 years, but that's not relevant. What is relevant is her medical condition has progressed to the point where it has become necessary for her, and now it is available. The state does provide it, whereas before they didn't. So she brings a new case under altered circumstances with a new injury under new and changed case law. Can I ask you maybe a follow-up question on that point relating to your client's claim for damages? The state is saying that even if we allow the injunctive relief claims to go forward, we should at least dismiss or uphold the dismissal of the claim for damages on qualified immunity grounds, because the case law as of 2016, I think is the relevant date, didn't put them, you know, the defendants sufficiently on notice that the surgery was required. What is your response to that? You know, again, like I pointed out in the papers, the district court didn't address this, because in order to do a qualified immunity analysis, this court has repeatedly held it has to be done as to each and every defendant. We have a whole chain of health care professionals from the committee who denied her that, to sort of the lowest level person who was looking after her. They're all named in the complaint, and neither the defendants nor the judges performed this analysis. So right now, to design qualified immunity would be to sort of blanket order, simply saying, just because there's CDC decided it was not necessary, CDCR decided it was not necessary, we have two sets of medical opinions. That means in every case, the CDCR could not be held accountable. They would simply have the professionals disagree, and based on that... No, no, counsel, I think it's more the question whether there was a clearly established right, not what, I mean, even if, whether the professionals agreed or disagreed or thought it was a good idea or didn't, what was the, prior to Edmo, what was the clearly established law that would have put them on notice that they, they were potentially violating a constitutional right? The case was dismissed in 2016. By the time the case was dismissed on these grounds, or would have been dismissed on these grounds, in 2015, there's, North Sylvie Beard was the first district court opinion by Judge Tigger, who found that because an inmate had severe liver impairment that was caused by estrogen therapy, that they did have a plausible claim that estrogen therapy can cause these effects, and that the medical professionals were indifferent. He also performed an analysis where he looked at the weight of, the relative weight of the two medical opinions and decided the state court medical opinion did not create a reasonable, legitimate medical difference of opinion, because on one side, you had people who were a G.I.D. who, you know, had done analysis of the liver impairment, whereas on the other side, you simply had a bunch of CDCR professionals who had no experience in G.I.D., who hadn't done so. He did the weighing. So in 2015 was the first case, North Sylvie Beard. I can give you the citation for that. Northern District of California. But that's a district court case, and I don't think we, I mean, there's a debate as to whether even circuit court cases can clearly establish that. Right. But I don't think there's any precedent that says district court decisions can clearly establish. I don't disagree, but it was evolving, changing law, and, you know, again, the judge did not make this decision in 2016. So we're, you're looking at qualified immunity now, on your own, in 2022, under a whole different set of law and circumstances. As I understand it, the decision that's being challenged here occurred in 2016, isn't that right? That's correct. But the decision did not make any finding of qualified immunity. It was not dismissed on qualified immunity grounds. No, no, no, I'm sorry. I just mean the decision by the defendants that you're saying violated the Eighth Amendment. So that's the relevant time point, that's the relevant point in time at which we have to say, okay, what was the state of the law then? Right. Right. And, and I, my thought was the same as Judge Graber's, is that, at least in our circuit, we didn't have a case until 2019, that for the first time, right? So that's, that's the problem. The Edmo case. So again, the, in this court case, there was also no precedent in the books. And in 2015, I think there was a Quinn case where the state itself had decided to provide SRS to a transgender defendant. So in 2015, the state had admitted already that SRS could be medically necessary in some cases. And, and the CDCR also had changed its rules by 2015, because in the Quinn settlement, they clearly state that this is something that they would, could potentially provide, should the right be medically necessary. So I think that right was definitely established both by the change in the rules. There might not have been presidential decision saying this is how it has to be. But SRS had become an alternative to estrogen therapy. So that, that's the right that she was fighting for, because she said, I have a new injury. Now SRS is available. And that's, that's the reason. So the primary right, as you asked me, that's why they had a committee now in place. So she's challenging the denial by the CDCR committee of a refusal of SRS, because now it had become an option, which had not been there before. So that is the primary right. That is the right she's fighting for, like a remedy that was not available before that's available now under her new injury. Okay, do you want to save the balance of your time for about, we'll certainly give you adequate time to respond to the state. Thank you. Thank you very much. Okay, counsel for the defendants is ready. Good morning, Your Honor. Alicia Bauer with the California Attorney General's Office for Defendants. I want to start by addressing one representation that counsel made about this new injury. And then I want to turn to the race judicata questions. And then I'd also like to get to the question on the time between when the surgery was approval and that it hasn't quite happened yet. So addressing a representation that counsel's made in her briefing on appeal that there's this new injury. So this idea that there's this new tumor, this new brain tumor that's developed. But what we know from the record, and this is at excerpts of record 107, and again, these are records that Stephen submitted, is that as of May 2016, an MRI was done and the results were negative. And so the estrogen was started again. So this idea that there's this new brain tumor, this new injury, that's actually contradicted by the record. There was an MRI done. Well, let me ask the more theoretical question, though, of you that I asked of opposing counsel. As I understand it, it has to be the same injury and the same wrong. That's at least the formulation in the San Diego police officer's case. And so if there is a different injury, for example, the one that I gave you, first you have diverticulitis and then later you have a cancerous mass in the same place and you want the same remedy, which is surgery for that. Wouldn't that be two primary rights? I would say that, Your Honor, that question is a little bit easier. If you're asking for the same exact surgery, but the reason for it, the source of it is different, that would be different. Well, you're saying factually it's not true, but very similarly, if there had been a benign condition and now there is a cancerous tumor and both of them suggest that surgery is the right answer, why isn't that the same thing? So even if that was true, Your Honor, it's the same harm that she's claiming. So from the very start, this goes all the way back to that first litigation. She's had this since 2005. It's an issue, a tumor issue that she's had from 2005 that's a result of the estrogen hormone therapy. And that was the reason why she was claiming that she should receive the gender-affirming surgery. Well, right. But you're arguing with me about the facts, which are obviously extremely important. If it's the same tumor, then, you know, then it's a more subtle question of maybe it was benign and now it's turned cancerous, although I would wonder whether that isn't a different injury as well. But if it's a different new tumor, is that a separate primary right? And I think this might help, Your Honor. So in the Broadheen case, the court there what the court does is it looks at the harm. And I think maybe there's a bit of conflation between harm and injury. So it talks about the harm in Broadheen as there the harm was a lack of meaningful review and a procedural harm. And the challenge conduct was that the warden basically that complaints about the appeals coordinator were being processed by the appeals coordinator. So the harm there and the challenge conduct there was this procedural harm. But in the subsequent case, the harm there was a retaliatory chilling of their right to file grievances. So the harms were different there. So there was the procedural harm. And then so here. Oh, sorry, Your Honor. Well, here the harm is I want gender affirming surgery. The estrogen therapy is not enough and it's causing me problems and you're not providing it for me. And we know that it's very similar because she submitted the records that she used in support of her prior cases in this case. So we know that she's making the same argument and that the policies underlying raised judicata is the idea of eliminating repeat litigation and not allowing litigants to come back and take another attempt at it and also potentially inconsistent results. So if Stevens could go forward. Let me just read a quote from one of the California cases that my law clerk found, which just seems to me to resolve the question against you and then you can tell me why it's wrong. It's just the general principle for race judicata in California is that the doctrine does not prevent a reexamination of the same question between the same parties where in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants. It seems to me that general principle describes exactly our case, at least as the plaintiff has framed it in her complaint, right? She's saying that sure, I'm asking for the same surgery, but the facts have changed in a very adverse way to me since that first decision. And so of course I can't be bound by the fact that I litigated and lost before because there's now this new set of facts and you have to assess the 8th Amendment, whether there's an 8th Amendment violation under those new facts. Why is that not controlling here? Your Honor, I would argue that there is not an alter, that it's not altering the legal right. Again, she's still seeking the same treatment with the same basis. Again, submitting those same reports. There's always going to be something new. So let's say, for example, an inmate wants a knee surgery and then he goes back and asks again. Now it's bothering him and it's more severe. He asks for it again. Does he get entitled? Is that going to be a new case there? Maybe because the 8th Amendment establishes a legal standard, right, that is going to in some way balance the necessity of the surgery versus the harm that's being or the pain that's being inflicted upon the inmate. And that balance in at time point one may look not terribly favorable for the for the inmate. But if things get progressively worse, which is what she has alleged, then the 8th Amendment question could come out differently at time two. And I think that's all that is being put before us here. And it seems to me it cuts against you. Right, and so I think again the core is to look at what was she alleging in the initial complaint. What was the harm? Again, the harm there. Here, if you look at her complaint here, she's alleging you're denying me gender-affirming surgery. The estrogen therapy causes me tumors. That's what she was alleging before. And my medical condition now as a result of receiving the therapy has gotten far worse than it was before. At least that's the allegation. Although what's interesting here, Your Honor, if you look back at the records and in her prior case she was appointed counsel. She had counsel representing her. She had experts that came in and provided reports and there was a rebuttal expert. So the court considered all of that. One of the things that the court looked at was that's expected. It's expected for those to happen. So that was a known expected risk of the therapy, the hormone therapy. So this was not a surprise to Stevens or to the institution that continue to provide her MRIs. That doesn't mean a different treatment isn't required. I mean it's expected that some people will have, you know, an allergic reaction to medication and if they do you don't keep giving it to them even though it was potentially expected. I'm not really sure what the expectation has to do with it. It's the idea that they were foreseeing that there was a potential that she could develop tumors and that they were monitoring. So that is in the record. So they were monitoring. I guess the foresight part of it escapes me in terms of relevance. I think it goes to Your Honor's question about whether or not it actually captures that potentially future case. And here we have facts that by but the fact that they knew that that was a potential of being denied that gender-affirming treatment and then it she's claiming it's now happening. That brings it closer into them being the same primary right. Counsel, if I may switch gears slightly if that's all right with my colleagues. I'd like you to address what the heck has happened. Why has there been no surgery? To be frank, just speaking for myself, I find it quite outrageous that this was approved three-plus years ago and has not been approved since 2019. And it's almost 2023. Right. And so her surgery was approved in 2019. Within months she was, and this is not in the record, but within months she was linked up with the surgery outside Surgery Center. And then within that same time period, so the beginning of 2020, we all know the pandemic hit. So the people, including me, had surgery during the pandemic. So that isn't completely a good answer. And there are a few factors here, Your Honor. So one is that the surgery centers were not taking, they were holding off on inmate patients because of the COVID-related issues with the inmates at the time. So that's one factor. So there were periods of time where the outside surgery centers were saying, next year, we're going to see them next year. We also know in the record that Stevens herself was not attending appointments. And so that's not in the record, but we know that she wasn't and that's going to delay the process. And so not everything here, and again what we do know in the approval, this is an outside surgery by an outside specialist. What is being done on the part of your clients to make it happen? So the defendants in this case are part of the review process, and so their part is done. The surgery has been approved. Now it's a matter of the outside surgeon who has preoperative requirements. And Steven even says this in one of her filings, it's a lengthy process. This is not a typical surgery where you go in, there's preoperative requirements, and we know that it can take months for those to even happen. And so the outside surgeon sets those requirements for the surgery that have to be completed. And I have examples there outside the record, but there's there's portions of this that has to be done before the surgery can take place. And it's important that it's not, CDCR should not be rushing or skipping those processes. It's at the direction of the outside surgery center. And there's only so many facilities that can handle these treatments, and so they're taking in as many inmates as they can. And we know since the pandemic, post- pandemic, at least two inmates have received their surgery this year. They're happening, it's just not an in-and-out type of process. There is time that needs to be taken for those surgeries. And we do know that Stevens has another appointment with her outside specialist for the end of the month. The surgery is progressing, it's moving, and we do understand that that would be a we understand that. But there definitely are multiple factors that go into that, that the time period between when, unfortunately, the approval happened right before the pandemic hit. And that definitely created a huge delay and backlog with the outside surgery centers. But again, she has an appointment with her specialist at the end of the month, and at that point they're going to know better when the actual surgery will take place. Again, some of these requirements are outside, definitely outside, of CDCR's control in terms of her completing what she needs to complete on her end also. The third point or category that you wanted to get to. Right. If I may, I'll address the qualified immunity that your honor raised. And so I think it... Can I ask, maybe I can just frame one question for you. This action was dismissed at the motion to dismiss stage, right? And the district court didn't do any qualified immunity analysis because it just rested it on Ray Stutakata, is that right? That's right, your honor. So why would we sort of take it upon ourselves, I mean you've urged this I think from remembering in the brief, but why would we do that analysis in the first instance ourselves? Why wouldn't we just say, I'll just speak for myself, I don't think the Ray Stutakata ruling is correct. So if we thought that, why not just reverse, send it back, and then you can make whatever arguments you want, and the district court can resolve it first. Why are you asking us to do that work, I guess is what I'm... So two points on that. One, your honor, is even if the court disagrees with the Ray Stutakata analysis, we still think that with the hundreds of pages that were submitted at the district court, very developed record, records you would typically see at the summary judgment stage, the district court also correctly found that there was a failure to state a claim here. But we think qualified immunity is important because damages question is important, but we also think that the appeal is moot. So if the court were to find that the appeal is moot, and then also find that the injunctive relief claims were moot. It's not moot, certainly as the damages claims cannot be moot, because you haven't paid them. So that, we'll just take that off the table. The injunctive relief claim is not moot, because she didn't ask, as far as relief, to have your clients merely approved the surgery. She asked to have the surgery performed, and it hasn't been. So the I think your argument is off point there. So put aside mootness, come back to my question. Why, if we're going to send this back for litigation, and I'm not saying we are, I'm just giving you my own view. If we're going to send it back for litigation on the injunctive relief claim, why wouldn't we just leave the matter of qualified immunity as to damages for the district court to resolve later? Because qualified immunity, and council identifies this in our briefing also, is that it can, should, be decided as early as possible. So it's a suit from not just liability, it's a suit, I mean, I'm sorry, it's a defense not just to liability, it's a defense from suit, especially before discovery. So if this court can decide that issue, and we think that it can, council cannot identify a case, we think that's critical, because there was not one. And so if this, the court can decide that issue, that could at least eliminate that aspect of the case, which is critical, and the suit at that point. And we think that's clear. And then it would just be the injunctive relief piece, and we do think that that piece is moved, because that's what she was asking for below. These defendants were involved with the approval or the denial of her request for surgery. That's what they're able to do, and that's what they've done in this case. And so they've provided everything that they can provide at this point. Well, I'm sure, I guess I just disagree with you on that. If your clients were to take the position that, well, we approved it, and you know, 20 years have gone by now, good point, but it is unfortunate that surgery hasn't happened. You know, it's not our fault. I'm sure the district court would have some coercive power over the defendants to speed things along if that kind of, you know, foot dragging occurred. And it seems, I share Judge Graber's sentiment, it seems like some of that has happened here, given the length of time. You've offered some explanation for the three plus years, but I don't think you can just say that once the approval occurs, we're done, and it's just, you're left to the whims of this private person outside the prison. Well, a couple of points on that, Your Honor. One is that it's very telling that plaintiff is not accusing CDCR of any sort of malfeasance here. They're not accusing CDCR of doing something or not doing something, and especially not these particular defendants of doing something or not doing something. So that's very important and telling. But the other piece here, Your Honor, is that, and this is the already LLC versus Nike case, when, you know, when challenge conditions, when the And that's what's the case here. So she's challenging the approval or the denial of her request for surgery. That has changed. Her circumstance has changed. She's previously was denied the gender-affirming surgery, and now she's been approved for that surgery. And that's what these particular defendants do. And I see that I'm over time. I apologize. We ask that the court affirm. Thank you. Okay, thank you very much. You have some time for rebuttal. I just want to point out that, you know, ER 117 and ER 112 are medical records that clearly show that there was a pituitary adenoma, and a dedicated MRI screening needed to be done for that. So the fact that, and they've never disputed that that condition exists, not in the district court, not in this court, but they point to 107 and say there was an MRI done that says it was negative. We don't know for what purpose that was done. We don't know if it was just not, you know. So I would not, based on 107 saying MRI was negative, dismiss that she has this condition, because it's never been disputed, till date, except today. That was one thing. The only other thing I want to address was the judge asking, so what was the right? I just want to say, you know, it was lack of adequate medical care, given that the SRS was being provided by the CDCR. Was the decision by the committee from 2013 to 2016 to deny her the right that she was alleging, that a bunch, I don't want to say a bunch, a group of non-GID doctors had decided, who had no experience in GID, they had, were deciding that she was not entitled to this surgery. So that's lack of adequate care. Okay, well before you sit down, I understand you took this case through our Courts Pro Bono program, is that right? On behalf of the panel, on behalf of the Court, we thank you for doing that. It really is essential for our Court to be able to have advocates like you take on these cases, so that we get presentation, vigorous presentation on both sides. Thank you for providing me with the opportunity. Thank you very much, we appreciate it. Okay, that, the case just argued is submitted, and we are going to take a 10-minute recess, and we'll be back for the last two cases. All rise.
judges: GRABER, GOULD, WATFORD